Filed 2/10/21  Performance Production Co. v. Virus Internat., Inc. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PERFORMANCE PRODUCTION COMPANY, | |
| Plaintiff and Appellant, | G058667 |
| v. | (Super. Ct. No. 30-2019-01051979) |
| VIRUS INTERNATIONAL, INC. et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Ronald L. Bauer, Judge.  Affirmed.

Vivoli Saccuzzo, Michael W. Vivoli and Jason P. Saccuzzo for Plaintiff and Appellant.

Severson & Werson, Jan T. Chilton and Kerry W. Franich for Defendants and Respondents.

* * *

Daniel Diaz (Diaz), doing business as Performance Production Company (PPC), sued Virus International Inc., Virus Tech, LLC and Russell Stone (collectively Virus), alleging Virus violated the Unfair Competition Law (Bus. and Prof. Code, § 17200, et seq. (UCL).) by underreporting the value of its products for the purpose of paying lower import tariffs. Virus successfully moved for summary judgment, arguing that Diaz lacked standing to sue under the UCL because he failed to establish the fact that he sustained any financial losses attributable to its alleged tariff impropriety.[1]

Diaz argues the trial court erred in granting the motion because his declaration filed in opposition to the motion contained sufficient evidence to establish Virus cheated on its tariffs, and that the cheating initially prevented him from entering the market to compete with Virus and later impaired his ability to sell his competing products.

We cannot agree. While the evidence Diaz provided was sufficient to demonstrate Virus cheated on its tariffs—and presumably benefitted in some way from that cheating—it was insufficient to establish a causal link between the cheating and the disappointing performance of Diaz's competing business. Diaz offered no evidence suggesting that Virus had underpriced its products as a consequence of its misconduct, thus giving it a competitive advantage in sales. To the contrary, Diaz himself alleges that Virus may have simply pocketed the ill-gotten gains as excess profit. Such a practice would qualify as a benefit to Virus, but would not harm its competitors, except in their

---

[1] Virus admits that it engaged in some tariff impropriety, albeit without acknowledging the specifics. This is irrelevant to our analysis, which focuses on whether Diaz has offered sufficient evidence to raise a triable issue of fact on the question of standing.

2

capacities as members of the public who generally benefit from tax payments. As the trial court found, this is not the kind of harm that supports standing under the UCL.

Diaz provided no evidence from any customer even suggesting that the customer would have purchased merchandise from Diaz, rather than Virus, had Virus not cheated on its tariffs. Nor has Diaz provided other evidence which, if believed, would establish that Virus's misconduct caused him to suffer financially as a consequence of Virus's misconduct, as is required to prove standing under the UCL.

The judgment is affirmed.

**FACTS**

Diaz, doing business as PPC, sells mixed martial arts (MMA) performance clothing. Some years ago, he was the designer of some of the first performance MMA "fight shorts," which are now widely manufactured or distributed by several companies, including some of the largest apparel companies in the world. Diaz previously worked as a commissioned salesman for Russel Lin, one of the principals who formed Virus, another company that sells MMA performance clothing.

Through other litigation, the specifics of which are not part of our record, Diaz learned that Lin had engaged in a practice of under-declaring the value of the goods he imported for sale, in order to minimize his tariffs. Diaz believed Lin had continued that same practice through Virus; Diaz was consequently discouraged for years from entering the market and trying to compete with Virus. However, Diaz ultimately decided to create PPC in September 2018, and he began selling MMA performance apparel despite what he believed was Virus's continuing illegal conduct.

In February 2019, Diaz filed a complaint against Virus in the name of PPC. The complaint seeks injunctive relief, attorney fees, and other just and appropriate relief, based on Virus's alleged violation of the UCL. The complaint alleges that Virus "engaged in a scheme to avoid the tariffs [it was] legally obligated to pay" by "caus[ing]

3

false customs documents to be presented or delivered to the United States Government [that] were false or fraudulent because they deliberately under-stated the prices being paid for the goods in question, specifically to avoid customs charges and/or duties owed by [Virus] to the United States Government."

According to the complaint, Diaz was harmed in his effort to compete with Virus because he "is competing lawfully in the market while [Virus and its principals] continue to give themselves an unfair advantage that allows them to maintain much higher profits, for example." Diaz specifically alleged that PPC "has lost money or property within the meaning of the UCL due to [Virus's] conduct because it cannot effectively compete and loses market share [due] to [Virus's misconduct]."

Virus took Diaz's deposition in May 2019. As of that date, Diaz was selling his goods directly to customers almost entirely online. He testified PPC sold approximately $4,300 worth of goods between October 2018 and May 2019. By contrast, Virus had approximately $17 million in sales from 2014 to 2019.

At his deposition, Diaz acknowledged he could not identify any customers he had lost to Virus, and stated he "would have no way of knowing" whether that had happened. He also testified that he did not know whether he had lost any market share to Virus, or whether he had lost any money as a result of Virus's misconduct. Diaz suggested that if he could review Virus's business documents, he might be able to "weigh what advantage that they were able to gain . . . ."

Relying on Diaz's deposition testimony, Virus moved for summary judgment on the ground that Diaz lacked standing to maintain a cause of action against it under the UCL.[2]

---

[2] Virus also moved for summary judgment on the ground Diaz could not demonstrate he was entitled to any remedy under the UCL, and Stone moved for summary judgment on the additional ground that he engaged in no unfair business practices in his individual capacity.

4

Diaz opposed the motion; he relied on his own declaration to demonstrate a triable issue of fact on Virus's claim that he "does not know of any sales lost to [Virus], does not know whether he has lost any market share to [Virus], and is unaware of any money lost a result of [Virus's] purported actions." In his declaration, Diaz stated that at his deposition he "could not identify any specific sales that [he] lost" to Virus "without seeing [its] business records." However, since the deposition, he had "been afforded the opportunity to review documents produced by [Virus], including documents reflecting the amounts [Virus has] declared as the value of the goods [it] imported, and which [it] then re-sold within the United States." According to Diaz, the documents "make clear that [Virus has], in fact, continued to under-declare the value of the goods [it] imports[s]," which "make[s] it virtually impossible for companies like mine to compete, since we accurately declare our values and pay our tariffs at the full price." He stated the documents also "make clear that, using the inflated profits earned by under-declaring the values of their imported goods, [Virus has] unfairly enjoyed more marketing and better advertising, leading to a larger market share than would have been possible without engaging in these practices."

Diaz did not identify what documents he reviewed, nor did he detail exactly how those documents supported his conclusions. With regard to his claim about Virus enjoying more marketing and better advertising, Diaz did provide an example: "For instance, [Virus was] able to secure a sponsorship with Daniel Cormier, a famous MMA star, as a result of the unfair advantage obtained through their practice of under-declaring the value of [its] goods." Diaz did not point to any facts linking the Cormier sponsorship to the funds Virus had saved on tariffs; he instead concluded, "[t]hose are the types of marketing advantage[s] a company is able to realize using illegal practices like under-declaring value to underpay tariffs on foreign imports."

Diaz also declared he "lost money as a result of [Virus's] illegal conduct" because he "was effectively kept out of the apparel industry due to my recognition there

5

was no point trying to compete with [Virus] when [it was] illegally enjoying inflated profits and increased market share as a result of [its] illegal conduct. During that time period I was deprived of profits I otherwise could and would have earned by competing in the apparel industry." Moreover, "[s]ince entering the industry . . . , I have been undercut by [Virus] as a result of [its] illegal practice of deliberately under-declaring [its] customs duties . . . ." Diaz provided no evidence or analysis to support these contentions.

Virus filed objections to Diaz's declaration, asserting it lacked foundation, was conclusory and speculative, and involved improper expert opinions.

At the hearing, Virus claimed that in order to establish standing, Diaz was required to demonstrate at least that "he has lost a single sale." Diaz countered that it was unnecessary for him to "calculate" damages by counting up lost sales. Instead, he claimed it was sufficient for him to establish "some identifiable, even trifle of an injury" which he could link to the difference between the tariff Virus was paying on a garment it imported, and the tariff it should have been paying. He claimed "[y]ou can . . . just do it by the number of shorts that they have sold."

The court granted the summary judgment motion, ruling that Diaz "was unable to provide any admissible evidence demonstrating a concrete injury resulting from [Virus's] alleged conduct [and] therefore lacks standing to assert his claim for alleged violations of [the UCL]." As the court stated at the hearing, "I just don't think that there is any evidence of whatever the defendant may have done that may have caused the plaintiff an injury."

The court entered judgment in favor of Virus. Diaz appeals from that ruling.

## DISCUSSION

1.  *Summary Judgment Standards*

Any party to an action may move for summary judgment. (Code Civ. Proc., § 437c, subd. (a); *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826 (*Aguilar*).) The object of the summary judgment procedure is "to cut through the parties' pleadings" to determine whether trial is necessary to resolve their dispute. (*Aguilar*, at p. 843.)

"A party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty . . . ." (Code Civ. Proc., § 437c, subd. (f)(1).) "A motion for summary adjudication may be made by itself or as an alternative to a motion for summary judgment and shall proceed in all procedural respects as a motion for summary judgment." (*Id.*, subd. (f)(2).)

"[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar, supra*, 25 Cal.4th at p. 850.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.) A defendant moving for summary judgment may satisfy its initial burden either by producing evidence of a complete defense or by showing the plaintiff's inability to establish a required element of the case. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 853.)

If a moving defendant makes the necessary initial showing, the burden of production shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar, supra*, 25 Cal.4th at p. 850.) If the plaintiff opposing summary judgment presents evidence demonstrating the existence of a disputed material fact, the motion must be denied. (*Id.*, at p. 856.)

In evaluating the summary judgment motion and opposition, the trial court "must consider all of the evidence and all of the inferences drawn therefrom." (*Aguilar,*

7

*supra*, 25 Cal.4th at p. 856.) The moving party's evidence is strictly construed, while the opponent's evidence is liberally construed. (*Id*. at p. 843.)

On appeal, we review the summary judgment ruling on a de novo basis. (*Aguilar, supra*, 25 Cal.4th at p. 860.) We consider all of the evidence submitted by the moving and opposing parties, except that to which objections were made and sustained. (*Ibid*.) "In undertaking our independent review of the evidence submitted, we apply the same three-step analysis as the trial court." (*Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1431.) "First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue." (*Id*. at p. 1432.)

2. *Standing for UCL Claim*

"The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.' [Citation.] Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.'" (*Kwikset Corp. v Superior Court* (2011) 51 Cal.4th 310, 320 (*Kwikset*).)

However, "[w]hile the substantive reach of these statutes remains expansive, the electorate has materially curtailed the universe of those who may enforce their provisions. As we recently explained: 'In 2004, the electorate substantially revised the UCL's standing requirement; where once private suits could be brought by "any person acting for the interests of itself, its members or the general public" [citation], now private standing is limited to any "person who has suffered injury in fact and has lost money or property" as a result of unfair competition. [Citations.] The intent of this change was to confine standing to those actually injured by a defendant's business practices and to curtail the prior practice of filing suits on behalf of '"clients who have not used the defendant's product or service, viewed the defendant's advertising, or had

8

any other business dealing with the defendant . . . .”’”” (*Kwikset, supra*, 51 Cal.4th at pp. 320-321.)

“To satisfy the narrower standing requirements . . . , a party must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim.” (*Kwikset*, *supra*, 51 Cal.4th at p. 322; *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 228 [UCL plaintiff must demonstrate it ‘“has suffered injury in fact and has lost money or property as a result of such unfair competition”’]; *Hall v. Time Inc.* (2008) 158 Cal.App.4th 847, 854 [UCL standing is satisfied when the plaintiff has “expended money due to the defendant's acts of unfair competition”].)

3.      *Diaz's Evidence of Damages*

In his pleadings and at oral argument, Diaz appears to concede that his deposition testimony provided insufficient evidence to create a triable issue of fact about whether he sustained financial damage as a consequence of Virus's underpayment of tariffs. But he contends the declaration he submitted in opposition to the summary judgment motion cured the deficiency.

In his declaration, Diaz seemed to recognize that the problem with his deposition testimony was his inability to identify any specific sales or market share that PPC lost to Virus: “At my deposition in this case, l explained that without seeing Defendants' business records, I could not identify any specific sales that I lost to Defendants (since I did not know who their customers were), nor could I fully determine the extent of the market share that Defendants managed to secure through their illegal business practice . . . . I have since been afforded the opportunity to review documents produced by Defendants in this case.” Diaz's declaration still failed to identify any sales or market share that he had lost to Virus. Instead, as Virus points out, Diaz's declaration

9

offered only conclusory claims of damage, based on what appears to be speculation and an assumption that anything which benefitted Virus's business or increased its market share, must necessarily have harmed PPC.

In the absence of such evidence, we cannot assume PPC was damaged merely because Virus prospered. Likewise, we cannot assume that any sale lost by Virus would necessarily result in a sale gained by a competitor like PPC. As Diaz himself pointed out in his declaration, the market for MMA performance wear is met by sellers much larger than Virus and PPC. As he explained, the type of performance shorts he originally designed were "now widely manufactured and/or distributed by other, larger companies, including some of the largest apparel companies in the world." Thus, we cannot assume that if a purchaser were dissuaded from purchasing from Virus, but nonetheless remained determined to own the type of performance wear it sells, he or she would have purchased it from PPC rather than some other competitor.

Even more fundamentally, Diaz has not pointed to any evidence demonstrating that Virus actually gained any competitive advantage as a consequence of its tariff violations—such as by selling its shorts for a lower price than it otherwise could have—as opposed to maintaining the same price it would have charged had it paid the proper tariffs and just taking its tariff savings as added profit. In fact, Diaz appears to assume that is what Virus did, stating in his declaration that Virus's "practice of under-declaring the value of clothing imported into the United States . . . enable[d] them to make larger profits than me."

Diaz theorizes the extra money allowed Virus to "enjoy[] more marketing and better advertising, leading to a larger market share than would have been possible without engaging in these practices." And while it sounds like a practice that could qualify as a competitive advantage—although not necessarily one that harmed Diaz—there is no evidence that Virus spent more money on advertising than it would have

10

absent its tariff underpayment, or that it increased its market share as a consequence of such conduct.  The theory is pure speculation.

Diaz claims he was "effectively" prevented from entering the market for a period of time because of Virus's unfair tariff practices.  But Diaz's claim is belied by his own admission the situation did not change when he later entered the market.  That admission demonstrates Diaz was not prevented from entering the market because of Virus's tariff practices; he chose not to.

Diaz also asserts in his opening brief that he "lost money as a result of [Virus's] practice of under-declaring the value of the goods it imports" since he sold goods "for smaller profits than Respondents because he truthfully disclosed the value of his imports."  He made a similar claim during his deposition.  But again, the fact that Virus may be cheating by not paying all tariffs due does not demonstrate Diaz has suffered any personal financial loss as a consequence.

Diaz relies on *Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758 (*Clayworth*), for the proposition that a plaintiff can establish standing under the UCL "even though the plaintiff lost no money or property."  We think that is a misreading of *Clayworth*.  In that case, several retail pharmacies sued manufacturers of brand-name prescription drugs, alleging that the manufacturers had unlawfully conspired to maintain prices for their drugs in California at levels above those charged for the same or comparable products in Canada.  The defendants argued the plaintiffs lacked standing under the UCL because they passed on the excess charges to their customers, and thus were not harmed by the practice.  The Supreme Court rejected the argument explaining that when the pharmacies paid the excess charges, they suffered a financial loss sufficient to establish standing, even if they later recouped that loss from the customer.  (*Id.* at p. 789.)

Diaz also relies on this court's opinion in *Law Offices of Mathew Higbee v. Expungement Assistance Services* (2013) 214 Cal.App.4th 544 (*Higbee*), as support for the proposition that a competitor's loss of market share caused by the defendant's unfair

11

competition is sufficient to confer standing under the UCL. We concur with that proposition. But *Higbee* is a pleading case, not a summary judgment case. Thus, all that was required in *Higbee* was for the plaintiff to *allege* that he had lost market share. He had no obligation to offer any evidence in support of that allegation. Here Diaz could not defeat summary judgment without offering evidence sufficient to prove that he had lost market share, or suffered some other financial consequence, as a consequence of Virus's unfair tariff practices. It was not enough for him to simply assert it.

Finally, Diaz relies on *Kwikset* to establish that standing requires no more than an """"identifiable trifle' of injury.""" (*Kwikset, supra*, 51 Cal.4th at p. 324.) But even that trifling injury must be specifically identified. Diaz has not done that. As such, he failed to raise a triable issue of fact on the question of standing. We consequently find no error in the trial court's summary judgment ruling.

**DISPOSITION**

The judgment is affirmed. Virus is to recover its costs on appeal.

GOETHALS, J.

WE CONCUR:

IKOLA, P. J.

THOMPSON, J.

12